IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND and )
HOWARD McDOUGALL, Trustee, )
 )
      Plaintiffs, ) No. 08 C 1103
  v. )
 ) Judge Robert W. Gettleman
AUFFENBERG FORD, INC., )
 )
      Defendant. )

**MEMORANDUM OPINION AND ORDER**

      Plaintiff Central States, Southeast and Southwest Areas Pension Fund (the "Fund") is a multiemployer pension fund mainly funded by contributions obtained pursuant to collective bargaining agreements. These agreements are executed by employers with unions representing the International Brotherhood of Teamsters. Plaintiff Howard McDougall serves as the trustee and "fiduciary" of the Fund, as that term is defined in section §3(21)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001. Plaintiffs (together, the "Fund") bring an ERISA claim against defendant Auffenberg Ford, Inc. ("Auffenberg"), pursuant to §502(g)(2) of the act, to collect unpaid contributions owed from a period beginning on May 1, 2006, and extending to February 10, 2007. The claim is based on Auffenberg's alleged violation of §515 of that act, 29 U.S.C. §1145. The Fund now moves for summary judgment, requesting the court award the damages and fees owed by the defendant. For the reasons discussed below, the motion is granted.

## BACKGROUND

Defendant Auffenberg Ford, Inc. ("Auffenberg") is an Illinois dealership whose primary business is the sale of vehicles. An ancillary part of that business is the operation of a parts and service department, which employs various tradesmen represented by the Local Union No. 50 ("Local 50"), such as mechanics, stockmen, and warehousemen. Local 50 negotiates on behalf of these union members with employers such as Auffenberg to secure collective bargaining agreements ("CBA") that guarantee the union members certain wages, working conditions, and retirement benefits.

Prior to the events that gave rise to this case, Auffenberg was a signatory to a CBA that expired in 1997. As part of that agreement, Auffenberg was to make payments to the Fund, to secure pension benefits for its members. At the expiration of the CBA in 1997, Auffenberg opted to terminate its duty to contribute, which resulted in the assessment of approximately $49,500 in withdrawal liability, which Auffenberg paid. Some of the veteran members of Auffenberg's workforce had earned significant pension credit as a result of that plan, but fell just short of the amount needed to qualify for a higher level of pension benefits.

When Auffenberg and Local 50 began to negotiate a new CBA in 2001, Local 50's president at that time, Al Green, suggested that Auffenberg begin paying into the Fund once again, so that those veteran members of Auffenberg's staff could complete the necessary credits they needed to obtain increased amounts of retirement benefits. Auffenberg was reluctant; it desired to avoid the withdrawal liability it had been assessed as a result of leaving the original agreement. In the course of these negotiations, Auffenberg discovered that the Fund offered a program, pursuant to 29 U.S.C. §1390, which allows a pension fund to offer a "free look," giving

an employer the opportunity to temporarily contribute into a pension fund without fear of being assessed withdrawal liability, should that employer choose to end its contribution obligation. The statute does not extend this free look indefinitely, nor does it give the employer the right to terminate its obligation, but provides, in pertinent part (29 U.S.C. §1390(a)):

> …an employer who withdraws from a plan in complete or partial withdrawal is not liable to the plan if the employer…had an obligation to contribute to the plan for no more than…the number of years required for vesting under the plan.

In the present case, the "number of years required for vesting under the plan" is five, which gives an employer entering into an agreement with the Fund—if the free look provision applies—five years to effect a complete or partial withdrawal without fear of being assessed withdrawal liability. In the course of negotiations, Al Green allegedly communicated to Auffenberg that the parties could negotiate a new CBA, with a duration of five years, which required Auffenberg to once again make contributions to the Fund under the "five year free look," assuring the parties that once the new agreement expired, so would Auffenberg's duty to contribute. Auffenberg signed the new CBA, which went into effect on May 1, 2001, and expired on April 30, 2006. Auffenberg also entered into a participation agreement with Local 50 and a trust agreement with the Fund, agreements which reflected and governed the contribution obligations that Auffenberg assumed as a result of signing the CBA.

The participation agreement provides for two ways in which an employer may validly terminate its obligation to contribute to the Fund: (1) The trustees may terminate at their discretion; or (2) the employer, no longer obligated by contract or statute to contribute, notifies the Fund, describing the reason the obligation ended. Further, when a new CBA is entered into or the employer and the union agree to change the standing agreement, the employer must

submit the entire agreement or modification to the Fund; absent this notification, the participation and trust agreements make clear that no changes are binding on the Fund.

At or around the same time as the 2001-2006 CBA was entered into by the parties, Auffenberg entered into a secondary agreement, purporting to cover a different group of his employees. The basis for this, on the advice of Green, was that Auffenberg split its workforce into two different groups—though still technically working for the same entity—a "Lincoln Mercury/Ford" group, and a "Ford" group. This would allow those employees whom the Auffenberg wished to earn further credit with the Fund to do so, and the rest of the employees to enter into a separate 401(k) plan. The Fund was not notified about this additional agreement.

Sometime during the 2001-2006 term, Al Green passed away. His successor in dealing with Auffenberg was Scott Alexander, who notified Auffenberg sometime before the expiration of the 2001-2006 agreement of Local 50's intent to renegotiate a new agreement.[1] The notification signaled Auffenberg that Local 50 desired to negotiate a completely new contract, thereby ensuring that the 2001-2006 agreement would officially terminate on April 30, 2006. However, Article 33, §1 of the 2001-2006 CBA—the "evergreen clause"—made clear that the

---

[1] Article 33 of the 2001-2006 CBA, Section 1, provides:

THIS AGREEMENT and Addendum shall become effective as of the First day of May, 2001 and shall remain in full force and effect until the Thirtieth day of April, 2006 and each year thereafter unless written notice of termination or desired modification is given at least sixty (60) days prior to any yearly expiration date by either of the parties hereto.

terms and provisions of the 2001-2006 CBA would remain in effect during the negotiation process, until the parties entered into a new agreement or reached impasse.[2]

Auffenberg and Local 50 entered into negotiations shortly thereafter. At the expiration of the 2001-2006 agreement, Auffenberg tendered a letter to the Fund, dated May 1, 2006, stating that its obligation to contribute had ended, and that it no longer had any intention to contribute to the Fund. As a justification for this action, Auffenberg pointed to the alleged agreement with Green—made during the negotiations of the 2001-2006 agreement—that the expiration of the 2001-2006 agreement would also effect Auffenberg's withdrawal from the pension program, with no liability, pursuant to the "five year free look." The Fund sent Auffenberg a letter in reply, stating that the May 1 letter was not sufficient to terminate Auffenberg's contribution obligation, and that its duty to contribute had not—and would not—end until the consummation of a new agreement or until there was no longer a living employee who was covered by the Fund.

At this time, Auffenberg and Local 50 were still in negotiation for a successor agreement to the 2001-2006 CBA. Pursuant to the "evergreen clause," the terms and conditions of that agreement remained valid and in effect until the completion of a new or modified agreement. The Fund claims that this was further evidence of Auffenberg's continuing duty to contribute. In November of 2006, while negotiations were still underway, Auffenberg tendered another letter to

---

[2]Article 33, Section 4, Part ii provides:

> [During negotiations for a new agreement] [a]ll terms and provisions of this contract shall be continued in full force and effect an extended from the termination date hereof to such time as the parties either enter into a new Agreement, or Agreement containing the desired modifications, or terminate further negotiations…

5

the Fund, which the Fund received in December of 2006, this time signed by Local 50's representative Scott Alexander, which reiterated Auffenberg's belief that they had no further duty to contribute as of April 30, 2006. Alexander claims in his deposition that he signed the December letter in the hope that it would spark a settlement agreement between the parties, but did not confirm that he thought the 2001 oral agreement existed.

The November 2006 letter was again founded on the alleged oral agreement between Auffenberg and Al Green during the negotiations of the 2001-2006 agreement. The Fund's reply was again that the letter was insufficient to terminate the obligation to contribute, arguing that the terms of the 2001-2006 agreement, the participation agreement, the trust agreement, and federal labor law required Auffenberg to contribute until the completion and submission of a new CBA to the Fund.

A new CBA was finalized and executed on February 8, 2007, and the agreement was sent to the Fund, which received it on February 10, 2007. The Fund accepted this submission as proper for the purposes of terminating Auffenberg's contribution obligation under the 2001-2006 agreement. Because the period for which Auffenberg was obligated to pay into the Fund was longer than five years, the "free look" provision did not apply, and the Fund audited Auffenberg to assess withdrawal liability. It was at this time that the Fund learned that contributions for all of Auffenberg's employees were not being made; rather, Auffenberg had made contributions only for the employees under the 2001-2006 agreement and not the secondary 401(k) agreement.

The Fund's assessment, therefore, covered all of Auffenberg's union employees—not just the handful for whom the 2001-2006 agreement was originally created—for the period extending from May 2001 to February 10, 2007. A few days after the suit was filed, Auffenberg

paid the contributions for the additional employees from May 2001 to April 30, 2006, but maintained that no further liability existed. The nature of this dispute, therefore, is whether an obligation existed from the period of May 1, 2006 to February 10, 2007.

## **DISCUSSION**

Legal Standard

The Fund moved for summary judgment under Fed. R. Civ. P. 56. A court should grant summary judgment if "there is no genuine issue of material fact and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits that demonstrate an absence of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

Parol Evidence Rule

Auffenberg's reliance on the oral agreement allegedly made during the negotiations for the 2001-2006 CBA is misplaced because evidence that Auffenberg relies on to demonstrate the existence of the alleged oral agreement is barred by the parol evidence rule. Where the parties have manifested their complete and final intent in the language of the contract, the parol

evidence rule bars any evidence of prior or contemporaneous oral agreements that are inconsistent with the terms of the contract. Restatement (Second) of Contracts, §§213, 216. "The parol evidence rule bars the introduction of the most questionable form of extrinsic evidence—self-serving testimony by one of the parties as to what the parties 'really' agreed to in the negotiations leading up to the signing of the contract." *Hoover v. ABF Freight System, Inc.*, 2008 WL 1805392. (C.D.Ill., 2008). The quoted passage is particularly relevant to the instant case because Auffenberg is attempting to introduce evidence as to what Auffenberg and Local 50 "really agreed to," with respect to the pension, in the run-up to the finalized 2001-2006 CBA. The agreements here are clearly integrated; where the language of an agreement appears to be the final manifestation of the parties' intent, and there is no evidence to the contrary, the agreement is considered to be integrated. Restatement (Second) of Contracts, §209(3). The language of all three agreements—the 2001-2006 CBA, the participation agreement, and the trust agreement—is clear and unambiguous as to terms, duration, and the requirements for termination. Specifically, there is no language in any of the agreements that would demonstrate that the duration of Auffenberg's contribution obligation was undefined or ambiguous. Nor does Auffenberg contend that any of these agreements is incomplete. Because the agreements are unambiguous, evidence of the oral agreement does not fall under the exception to the parol evidence rule allowing admission of extrinsic evidence to interpret an ambiguity in the agreement. As such, admission of evidence to demonstrate the existence of the alleged oral agreement between Auffenberg and Local 50 is barred, there is no issue of material fact, and the written contracts govern.

Admissibility of Oral Agreements Under Federal Law

29 U.S.C. §1102(a)(1) states, in pertinent part: "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." The Seventh Circuit has adopted similar reasoning under different statutes, evidenced by its ruling in *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, concluding that both §515 of ERISA (29 U.S.C. §1145) and §302(c)(5)(B) of the NLRA (29 U.S.C. §186(c)(5)(B)) "prevent[] a court from giving force to oral understandings between union and employer that contradict the writings." *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1154 (7th Cir. 1989). That is exactly the type of agreement upon which Auffenberg bases its case. Quite simply, federal law precludes a court from considering an oral agreement allegedly made between an employer and a union if that oral agreement contradicts the written agreements. Why Auffenberg did not include in the language of the 2001-2006 CBA that its obligation to contribute to the Fund's pension would terminate at the end of the "five year free look," is not for the court to say. Consequently, the court concludes that there is no genuine issue of material fact surrounding Auffenberg's defense.

<u>Duration of Auffenberg's Contribution Obligation</u>

The parties make several arguments over the validity of piecemeal implementation of terms and policies of a new, unfinished CBA while negotiation was still underway, and the "evergreen clause" was still in effect. Whether Auffenberg and Local 50 could implement new provisions piecemeal while negotiations for the 2007 CBA were underway need not be reached by the court, because the parties have not presented any evidence that such an agreement had been reached before February 8, 2007, the date the 2007 CBA was executed. Rather, all of Auffenberg's proffered evidence relies on the alleged oral agreement made in 2001 between

9

itself and Local 50. The May and December letters authored by Auffenberg and sent to the Fund were to put the latter on notice that an agreement had been made in 2001 which, Auffenberg argued, would allow Auffenberg to terminate its contribution obligation on April 30, 2006. There is no indication in either letter that states that the parties had, at the time they were written, come to any sort of present agreement on the matter. Indeed, the evidence seems to indicate that Auffenberg continually relied on the alleged oral agreement to attempt to terminate its contribution as of April 30, 2006, when it believed it would incur no withdrawal liability. Section 515 of ERISA, 29 U.S.C. §1145, provides that an employer who makes contributions to a multiemployer plan under a CBA must do so in accordance with the terms and conditions set forth by the plan, provided those terms and conditions are not inconsistent with the law. "This means…that a plan may enforce the writings according to their terms, if 'not inconsistent with law.'" *Central States, Southeast and Southwest Areas Pension Fund v. Indy Transport, Inc.*, 2007 WL 734389 (N.D.Ill., 2007) (quoting *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service,* 870 F.2d 1148, 1154 (7th Cir. 1989)). In *Pension Fund v. Indy*, 2007 WL 734389 at *4 (N.D.Ill 2007), the defendant was bound by the same participation and trust agreements as Auffenberg is here. The *Indy* court strictly adhered to the notice requirements of those agreements when considering what the defendant needed to do to terminate its contribution obligation (*Id.*):

> The participation agreement requires written notice that Indy is "no longer under a legal duty to make contributions" and the "specific basis" for termination….
> The trust agreement requires that Indy provide the pension fund the new bargaining agreement for review….Both agreements obligate Indy to continue making contributions until the notice provisions are satisfied.

The justification for this position is that the Fund is a third-party beneficiary of the participation agreement, and the employer's obligation to contribute continues even if the CBA has ended. *Central States, Southeast and Southwest Areas Pension Fund v. Dussault Moving, Inc.*, 871 F.Supp. 1046, 1048 (N.D.Ill., 1995). Thus, the position adopted by the *Indy* court is on point: "The trust agreement's plain language indicates only one way to terminate the contribution obligation: submit a new bargaining agreement for approval by the pension fund." *Indy*, 2007 WL 734389 at *4. Auffenberg would also have been able to terminate its obligation if the parties had reached an impasse in their negotiations, which would—as with executing a new agreement—dissolve the "evergreen clause" and discontinue Auffenberg's contractual duty to contribute.

At the time Auffenberg entered into the 2001-2006 agreement and its duty to contribute was created, it also entered into the same participation and trust agreements that were at issue in *Indy*. The participation and trust agreements clearly provide only two ways in which that agreement would be terminated, and the actions that an employer must take in order to discontinue its contribution obligation.[3]

---

[3]¶5 of the Participation Agreement states:

This Agreement and the Employer's obligation to pay contribution shall not terminate until either a) the Trustees decide to terminate the Agreement and provide written notice of their decision to the Employer or b) the Employer is no longer obligated by a contract or statute to contribute to the Fund(s) and the Fund(s) have received a written notice directed to the Fund(s)' Contracts Department…which describes the reason why the Employer is no longer obligated to contribute.

¶6 of the Participation Agreement states:

When a new collective bargaining agreement is signed or the Employer and the Union agree to change the collective bargaining agreement, the Employer shall promptly submit

11

There is no evidence that before February 10, 2007, the Fund had received any agreement or modification terminating Auffenberg's contribution obligation. Thus, the court concludes that Auffenberg's contribution obligation continued until the Fund's receipt of the 2007 CBA, which was February 10, 2007. Before that time, Auffenberg had no contractual or statutory right to terminate its contribution obligation and the 2001-2006 CBA, requiring payment into the Fund, remained in effect under the terms of the "evergreen clause."

Damages

Under ERISA, a plaintiff that brings a delinquent contribution suit under 29 U.S.C. §1145 is entitled to the unpaid contributions, interest, doubled interest, and fees and costs. 29 U.S.C. §1132(g)(2). The Fund is seeking a total of $72,682.20, which consists of: $46,500.00 in unpaid contributions, $9,309.60 in interest, another $9,309.60 in doubled interest, and $7,563.00 in audit fees and costs. Auffenberg does not dispute this amount. An award of ERISA damages is proper where the defendant presents nothing to refute the calculation. *Laborers' Pension Fund v. RES Environmental Services, Inc.*, 377 F.3d 735, 739-40. (7th Cir. 2004). Therefore, judgment is entered in the requested amount of $72,682.20.

## **CONCLUSION**

For the reasons stated above, the motion for summary judgment is granted in favor of plaintiff Central States, Southeast and Southwest Areas Pension Fund, and Howard McDougall, trustee, against defendant Auffenberg Ford, Inc., in the sum of $72,682.20.

**ENTER:** July 9, 2009

---

the entire agreement or modification to the Fund(s)' Contracts Department…. Any agreement or understanding which affects the Employer's contribution obligation which has not been submitted to the Fund(s) as required by this paragraph, shall not be binding on the Trustees and this Agreement and the written agreement(s) that has been submitted to the Fund(s) shall alone remain enforceable.

_____
**Robert W. Gettleman**
**United States District Judge**